## Covenant Mutual Life Association v. Louisa J. Tuttle.

1.  BENEFICIARY ASSOCIATIONS — *Assessments to be in Accordance with the Original Contract.*—Assessments in fraternal insurance associations must be made in accordance with the terms of the original contract of the member.

2.  SAME—*Burden of Proof—Legality of Assessments.*—The burden of showing the legality of an assessment of a fraternal insurance association, and the power of the officers to make it, is upon the association.

3.  SAME—*Burden of Proving a Forfeiture.*—The burden of proving a forfeiture of a member's certificate for non-payment of an assessment is upon the association.

4.  SAME—*What Constitutes the Contract of Insurance.*—Where the indorsements upon the certificate of membership, and made a part thereof, expressly provide that the application for membership and the certificate "shall constitute the complete and only contract" between the certificate holder and the association, such application and certificate constitute the contract.

5.  SAME—*By-laws May be Made a Part of the Contract.*—It is undoubtedly competent for parties to make contracts with reference to the by-laws then existing, or which might thereafter be adopted, and when such contracts are so made, such by-laws become a part of the contract.

6.  SAME—*Right to Make Changes in By-laws.*—Where the contract contains an express provision reserving the right in the association to amend or change its by-laws, it will have the right so to do; and where

in a certificate of membership it is provided that members shall be bound by the rules and regulations then governing the council or fund, or that might thereafter be enacted for such government, and such conditions are assented to, and the members accept the certificate upon such conditions, it is a sufficient reservation of the right in the society to amend its by-laws.

7. Same—*By-laws as a Part of the Contract.*—The better opinion is, if it is conceded that by-laws in force when the certificate is issued enter into and become a part of the contract, that it is only those then in existence; and that the society has no right, by amending or repealing any of them, without the consent of the certificate holder, and in the absence of any such right reserved in the contract, to impose new conditions or burdens, affecting the contract to his injury, or by a new provision, passed after the making of the contract, to forfeit his rights under it.

8. Same—*Rights of Members.*—In a contract of mutual benefit insurance the member acts for himself and not as a part of the society; his rights rest upon his contract of insurance, and not upon his contract of membership in the society. A corporator in a mutual benefit society, like a stranger, may enter into a contract of insurance with it, and his rights under the contract will be as fully protected as those of a stranger.

9. Estoppel—*In Pais, Arises When.*—Equitable estoppels, or estoppels *in pais*, only arise where one by his words or conduct willfully causes another to believe the existence of a certain state of things, and induces him to act on that belief, so as to alter his previous position; the former is concluded from averring against the latter a different state of things as existing at the same time.

10. Same—*By Paying Illegal Assessments.*—A member of a fraternal insurance association, in paying previous illegal assessments, can not be said to have acted fraudulently, or willfully done anything calculated to mislead others to their injury, so as to estop himself from questioning subsequent illegal assessments.

11. Evidence—*Opinions of Insurance Actuaries.*—Opinions of insurance actuaries and reports of insurance commissioners of various States are not competent evidence in an action against a fraternal insurance association of this State on a beneficiary certificate.

**Assumpsit,** on a certificate of membership in a fraternal insurance association. Appeal from the Circuit Court of Winnebago County; the Hon. John C. Garver, Judge, presiding. Heard in this court at the October term, 1899. Affirmed. Opinion filed February 1, 1900.

T. A. Moran, Geo. W. Wall and Wm. C. Calkins, attorneys for appellant.

The certificate in evidence was not the entire contract

between the defendant company and the assured.   The by-laws of the association in existence at the time such contract was made, entered into and form a part of the contract, even though not referred to in the certificate, and as those by-laws then in force reserved the right to the company to change and amend the same, the certificate holders must necessarily be bound by all subsequent amendments to the by-laws affecting the obligations of this contract.   3 Am. & Eng. Ency. of Law, 2d Ed., 1064–1081; Bliss on Life Ins., 2d Ed., Sec. 463; May on Ins., 3d Ed., 552; Niblack on M. B. Ins., 2d Ed., Sec. 136; Bacon on M. B. Socs., 160; C. M. B. A. v. Spies, 114 Ill. 468; R.v. P. Ass'n v. Robinson, 147 Ill. 138; Fullenwider v. Royal League, etc., 73 Ill. App. 321; Barbot v. M. R. F. L. A., 100 Ga. 681; Sup. Lodge K. P. v. Knight, 117 Ind. 489; Poultney v. Bachman, 31 Hun, 49; Stohr v. M. F. Soc., 82 Cal. 557; Pfister v. Gerwig, 122 Ind. 567; B. M. Ins. Co. v. Van Winkle, 12 N. J. Eq. 333; Miller v. Hallsborough M. F. Ins. Ass'n, 42 N. J. Eq. 459; Davidson v. Old People's M. B. Soc., 39 Minn. 303; Figure v. St. Joe M. Soc., 46 Vt. 369; St. P. Soc. v. McVey, 92 Pa. St. 510; Susquehanna Ins. Co. v. Perrine, 7 W. & S. 348.

The business of life insurance, and particularly of insurance by mutual insurance associations, is subject to be controlled by the State, and the State may impose such duties and obligations upon such associations as will require them to change their method of assessment and modify their contracts with their policy holders.   Hunt v. Le Grand Roller Skating Rink Co., 143 Ill. 118; Lehman v. Clark, 174 Ill. 279; Act of 1893, Hurd's Statutes of 1898, p. 960.

The original plan of post-mortem assessments adopted by this company having proved a failure, and it having been demonstrated that the association would become bankrupt if it continued upon the original plan, it was the duty of the association to adopt such changes from time to time as would keep the corporation solvent and enable it to go on to accomplish the purpose of its creation.   Bruce v. The Continental Life Ins. Co., 58 Vt. 253; Seymour v. M. R. F. L. A., 35 N. Y. Sup. 793; Figure v. The St. Joseph. Mutual

Society, 46 Vt. 369; Stohr v. The Mutual Fund Society, 82 Cal. 557; Fullenwider v. The Royal League, 73 Ill. App. 321.

By assenting to and acquiescing in all the changes made by the association from 1890 to 1897, and continuing to pay for his insurance upon a plan entirely different from the one specified in his certificate, the assured induced the company to place itself in a position where it could no longer comply with the strict letter of his certificate and induced all the persons who became members after 1890 to do so upon the presumption that he acquiesced in and assented to the power of the company to make such necessary changes in their plan of insurance, and to so modify his original certificate as to enable the company to collect from him the actual cost of his insurance, and by so doing he estopped himself from insisting that the company had no right to assess him on other than the original basis, and from holding the company liable where he elected not to pay an assessment regularly made, and which did not exceed the cost of his insurance. The doctrine of estoppel is constantly applied at law, except when permanent interests and land would be affected. Herman on Estoppel, Chap. 44, Sec. 1297 *et seq.;* Stock Yards v. Wiggins Ferry Co., 102 Ill. 523; Commercial Ins. Co. v. Ives, 56 Ill. 402; Lycoming Fire Ins. Co. v. Dunmore, 75 Ill. 14; Phœnix Ins. Co. v. Tucker, 92 Ill. 64; Board of Supervisors v. City of Lincoln, 81 Ill. 156; Martel v. East St. Louis, 94 Ill. 67; Goeing v. Outhouse, 95 Ill. 346; Fire Ins. Co. v. Oberholser, 172 Pa. State, 232.

FISHER & NORTH, attorneys for appellee.

The issuance of a certificate is evidence of good standing which is presumed to continue until the contrary is shown, and the burden of proof to establish forfeiture by competent evidence is on the association, and the association must show by competent evidence that the assessment upon which they seek to avoid the certificate was valid. Ind. Order of Foresters v. Zak, 136 Ill. 185; N. W. Trav. Men's Ass'n v. Schauss, 148 Ill. 304, and 51 Ill. App. 78;

Kumle v. Grand Lodge, etc., 110 Cal. 204, 42 Pac. 634; Tobin v. Society, 72 Ia. 261, 33 N. W. 663; Spencer v. Ass'n, 37 N. E. 617; Tourville v. B. of L. F., 54 Ill. App. 77; Bagley v. A. O. U. W., 46 Ill. App. 411; Bacon on Life Ins., Sec. 377; Niblack on Mut. Ben. Soc's, (1st Ed.), Sec. 280.

Forfeitures are not favored in law, and in order to work a forfeiture of the rights of membership in a mutual association, it must clearly appear that such was the meaning of the contract, and the facts upon which the forfeiture is claimed must be proved by the most satisfactory evidence. The certificate of membership must be construed liberally in favor of the assured. Order of Chosen Friends v. Austerlitz, 75 Ill. App. 74; Protection Life Ins. Co. v. Foote, 79 Ill. 369; Benefit Ass'n v. Tucker, 157 Ill. 194; Union Mutual Acc. Ass'n v. Frohard, 33 Ill. App. 179, and 134 Ill. 228; Polish R. C. U. v. Warczak, 82 Ill. App. 351; Hardesty v. Forest Ins. Co., 77 Ill. App. 413; Healey v. Acc. Ass'n, 133 Ill. 556.

The certificate introduced in evidence and the application comprise the entire contract between defendant company and the assured. Cov. Mut. Life Ass'n v. Baldwin, 49 Ill. App. 203; Royal Temp., etc., v. Curd, 111 Ill. 284; Com. Acc. Co. v. Bates, 176 Ill. 194; Ind. Order of For. v. Zak, 136 Ill. 185.

The contract of insurance made with a mutual company does not differ essentially from the ordinary contract of insurance with a stock company, where the contract or policy is complete in itself; that is, where the liability of the company is fixed by the policy or membership certificate, and the insured does not depend upon the by-laws to determine the nature and amount of his insurance. In the latter case, it has been seen that the association could generally, by the amendment of the by-laws, alter or vary the terms of the contract, and in the former case no such right is reserved to the association, and it becomes as perfectly bound by the terms of that contract, as it would if made with a stranger. N. E. and Mut. Fire Ins. Co. v. Butler, 34 Me. 451; Warnebold v. Grand Lodge, etc., 83 Ia. 27;

N. W. Ben. and Mut. Def. Ass'n of Ill. v. Wanner, 24 Ill. App. 357.

A provision in the certificate will prevail over a clause in the by-laws, no charter restrictions being violated. 3 Am. and Eng. Encl. of Law (2d Ed.), 1083; Hale v. Equit. Def. Union, 168 Pa. St. 377; Fitzgerald v. Equit. Relief Fund Ass'n, 2 N. Y. Sup. 214; Benefit Societies and Life Ins. (Bacon), Sec. 161 A.

Failure to pay excessive assessments not provided for in the certificate does not forfeit same, and payments of previous excessive assessments do not waive right to refuse to pay similar excessive assessments, and assessments made in violation of the contract of insurance are invalid, and no forfeiture can be declared for failure to pay illegal assessments. Farmer's Mut. Fire Ins. v. Knight, 162 Ill. 470; Cov. Mut. Ben. Ass'n v. Baldwin, 49 Ill. App. 203; Morgeson v. Mass. Ben. Ass'n, 42 N. E. 1132; Langdon v. Mass. Ben. Ass'n, 44 N. E. 226; Benton v. Brotherhood, 146 Ill. 570.

The association could not modify or change the contract of insurance without the express consent of the insured, after the receipt of the certificate. Ill. Con. Female College v. Cooper, 25 Ill. 148; 5 Am. and Eng. Encl. of Law (2d Ed.) 96; Startling v. Supreme Council, etc., 66 N. W. 340; Wheeler v. Iron Hall, 68 N. W. 229; Cov. Mut. Ben. Ass'n v. Baldwin, 49 Ill. App. 203; S. F. R. M. v. Hammers, 81 Ill. App. 560; 3 Am. and Eng. Encl. of Law (2d Ed.) 1084.

But parties may contract with corporations in reference to laws of after enactment, and may engage to be bound and affected thereby. 5 Am. and Eng. Encl. of Law (2d Ed.), page 97.

The act of 1893 relating to benefit societies has no retroactive force, and does not apply to certificates issued by a society prior to its re-organization under that act. Moore v. Guaranty Fund Life Soc., 178 Ill. 202; Voigt v. Kernsten, 164 Ill. 314; Benton v. Brotherhood, 146 Ill. 570; Bastian v. Modern Woodmen, 166 Ill. 595; Rowell v. Cov. Mut. Life Ass'n, 176 Ill. 557; Moore v. Chicago G. F. L. Soc., 76 Ill. App. 433; Roxbury Lodge, etc., v. Hawking, 38 Atl. Rep. 693.

Opinions of actuaries and reports of commissioners of insurance of various States, are not competent evidence. Bagley v. Grand Lodge, etc., 131 Ill. 498.

Where the contract provides that upon the death of a member an assessment shall be levied upon the members to pay the claim, no assessment can be made in anticipation of losses, and while there is money on hand with which to pay all losses accrued. Niblack on Mut. Ben. Soc., Sec. 283; Cov. Mut. Ben. Ass'n v. Baldwin, 49 Ill. App. 203.

MR. PRESIDING JUSTICE CRABTREE delivered the opinion of the court.

This was an action of assumpsit brought by appellee against appellant to recover the amount claimed to be due upon a beneficiary certificate issued by appellant upon the life of Isaac C. Tuttle, now deceased, and in which certificate appellee was named as the beneficiary.

It was averred in the declaration that on March 4, 1879, appellant executed and delivered to said Isaac C. Tuttle a certificate of membership in the defendant association for the sum of $5,000, and that thereafter said certificate was surrendered, and by mutual agreement between the parties the amount was reduced one half, and a new certificate issued, which constituted said Isaac C. Tuttle a member of said association with all the rights and privileges of the same, and provided that " upon due notice and satisfactory proof of the death of the aforesaid member having been filed with the secretary of the association, he having in all respects complied with the conditions of said certificate, an assessment shall be made upon all the members liable at the time of the death of said member " for a sum sufficient to meet the amount named in the certificate ($2,500), to be paid to Louisa J. Tuttle as beneficiary; which certificate was issued by the association and accepted by said Isaac C. Tuttle upon the express conditions and agreements set forth on the back thereof, which were made a part of the contract. The certificate, together with the conditions printed thereon, being twelve in number, as well as the

application, were all set out in full in the declaration. It was further averred that during his life said Isaac C. Tuttle kept and performed all the conditions of his contract by him to be kept and performed, to keep said certificate in full force and effect, and that he died October 29, 1898, being still a member of said association, and his certificate in full force and effect. It is further averred in the first count that after the death of said Tuttle proofs of death were duly made and filed with the association, and it thereupon became its duty to make an assessment upon its members to pay the amount of such certificate, and that on December 1, 1898, it did levy such an assessment and collected therefrom the sum of $2,500. In the second count it is alleged such an assessment was made and that it was sufficient to realize the sum of $2,500.

By an additional count the duty of appellant to make the assessment is charged and it is averred that such an assessment would realize a sum greatly in excess of the amount necessary to pay the sum mentioned in the certificate, and that the defendant failed and refused to make such assessment.

The pleas were, first, the general issue; second and third, that the said Isaac C. Tuttle failed to pay assessment No. 149 for $46.93, which was properly levied March 1, 1898, whereby his certificate became null and void. The fourth plea (designated in the record as the third special plea) averred that the legislature of the State of Illinois in 1893 passed an act to incorporate companies to do the business of life and accident insurance upon the assessment plan, and to control such companies in this State, which act was approved and in force June 22, 1893; that the defendant on August 1, 1893, reincorporated under said act, and has since that time been conducting its business under and within the provisions of the same; that one of the conditions of said act provided " that the trustees, directors, managers or persons designated in the by-laws of the corporation, subject to the provisions of this act, shall fix the fee, rate, amount of premiums, assessments, or periodical calls, and

the time and manner of payment thereof, and the risk to be assumed by such corporation and the duration thereof, and may change the same from time to time as the experience of the corporation may require;" that on March 1, 1898, the directors levied call No. 149 against the certificate of Isaac C. Tuttle, under and by virtue of the by-laws of said defendant association adopted pursuant to such re-incorporation under said act, for the sum of $46.93, which sum was for one of the six bi-monthly assessments authorized by the certificate, and was no more than was necessary to cover the cost of insurance enjoyed by said Isaac C. Tuttle under and by virtue of his said certificate, and that said Tuttle failed to pay the same within the time limited, and his certificate became null and void.

The plaintiff took issue upon the first, second and third pleas and demurred to the fourth. The demurrer was sustained to the fourth plea, and the defendant elected to abide by its plea.

We have thus set out the substance of the pleadings at some length, in order that it might clearly appear what were the issues involved in the trial of the cause.

By agreement of parties a jury was waived and the cause tried by the court. The issues were found for the plaintiff, the damages assessed at $2,531.25, and judgment entered against appellant for that amount. The proper exceptions were saved and defendant appealed to this court.

The principal errors assigned and relied upon by appellant are:

That the court found and held that assessment No. 149 levied against the certificate of Isaac C. Tuttle was illegal and void, and not binding upon appellee.

That the court refused to hold as the law of the case the propositions of law from one to seven inclusive, presented by appellant.

That the court erred in finding that the re-adjustment of rates made by appellant, upon which assessment No. 149 is based, was illegal and void.

And that the court erred in not finding that appellant

had the right to raise the assessment against the certificate
of Isaac C. Tuttle and others, to a sufficient amount to
enable it to pay its mortuary liability.

Other errors are assigned but do not appear to be relied
upon in argument, and therefore need not be considered.

The whole controversy in the cause turns upon the prop-
osition as to whether or not appellant had the right to levy
assessment No. 149 against the certificate of Isaac C. Tuttle,
which it is conceded was a large increase over any other
assessment he had ever been called upon to pay, and very
much in excess of the assessments specified and agreed upon
in the original contract.

It is not claimed that the assured ever failed or refused
to pay any other assessment levied against his certificate
nor that he was in default in any other matter except the
non-payment of assessment No. 149, for which his certificate
could be forfeited.

No question is made as to the death of Isaac C. Tuttle,
nor as to the sufficiency of the proofs of death, but appel-
lant denies all liability for the reason that assessment No.
149 was never paid, and it insists that the certificate was
thereby forfeited, null and void, at the date when the
assured died.

On the other hand it is contended by appellee that
assessment No. 149 was illegal; that appellant had no right,
power or authority to make the same, and that its non-pay-
ment by Tuttle was not a ground for declaring a forfeiture
of his certificate. In his oral argument before this court,
counsel for appellant stated that the question here involved
was one of first impression, and it becomes important,
therefore, that it be carefully considered, to the end that a
proper conclusion be arrived at.

It appears from the evidence that appellant was originally
incorporated January 9, 1877, under the general laws of
1872 of this State, by the name of "Covenant Mutual Ben-
efit Association," as a corporation not for pecuniary benefit;
the object being to furnish financial aid to the widows and
families of deceased members; that it was re-incorporated

under the act of 1893, and the name changed to "Covenant Mutual Life Association."

The general plan of operations, as shown by the first set of by-laws, constituted each certificate holder a member of the association, and provided that upon the death of a member an assessment should be made upon the surviving members of a fixed amount, which, being collected, should be paid over to the beneficiary named in the certificate.

The certificate holders were divided into five groups, according to age; the rates running from seventy-five cents for the first group up to $2 for the fifth. Assessments of these amounts were made bi-monthly on each of the members respectively, according to the group in which they were placed, and these assessments, together with a small amount for expenses, were the whole cost of the insurance according to the original plan.

The certificate involved in this suit (or the original for which this is a substitute), was issued to Isaac O. Tuttle March 4, 1879, he being then upwards of fifty-eight years old, which brought him into the fifth group.

The first of the conditions upon the back of the certificate, which are expressly made a part of the contract, reads as follows:

"1st. The person on whose application this certificate of membership is issued, hereinafter called the certificate holder, agrees to pay a mortuary assessment of $2 on the death of each and every member of this association occurring subsequent to the date of this certificate, or such proportional part thereof—all members being assessed ratably according to the certificate held by each—as may be necessary to secure an aggregate amount, not less than the sum required for the payment of the claim; and further agrees to pay all assessments which may from time to time be levied by the directors or managers for expenses and collection costs, not exceeding twenty-four cents per month, reckoned from the date of certificate, or last assessment collected, and further agrees that the aforesaid assessments shall be paid to the said association at its principal office in Galesburg, Illinois, within thirty (30) days from the date on which the notice relating thereto bears date, and the failure to pay such assessment, as above provided, or any one of them, or any part thereof, shall render this certificate null and void."

The second condition is as follows:

" 2d.   It is mutually agreed by and between the association and this certificate holder, that there shall be six assessments and six only, issued each year, which assessments shall cover the entire cost of insurance, and include mortuary, expense and collection costs, and be issued on the first day of January, March, May, July, September and November each year, and close thirty (30) days from date."

The twelfth condition contains the following:

" 12th.   It is expressly understood and agreed that the application for membership bearing even number herewith, and this certificate, shall constitute the complete and only contract between said certificate holder and this association, and shall be subject to and construed only according to the laws of Illinois, the place of this contract."     *     *     *

It appears that all policies issued by the association prior to 1890 were substantially the same as the one under consideration, and until that year the association assessed its certificate holders according to the terms of their contracts as set forth in the certificates, except that some additional assessments were levied for the purpose of accumulating a reserve fund, which fund on January 1, 1890, amounted to $343,433.86.   At that time the association ceased issuing policies or certificates providing for post mortem assessments; the by-laws were amended February 9, 1890, and the society commenced to assess, not only to pay death losses, but to create a permanent or contingent fund.

In 1895 another change was made in the by-laws and in the manner of making assessments.   The group plan was abandoned, and each certificate holder was assessed according to his age at the time he became a member of the association, according to the ordinary life insurance rates, and each assessment under this plan produced a sum in excess of $100,000, being an amount largely in excess of what was necessary to pay death losses; the purpose being to create a permanent or contingent fund.

In 1898, another, and still more radical change was made in the rates and manner of making assessments.   The association then commenced to assess the certificate holders, not according to the group plan, and not according to the age

·at the time of entry into the society, but according to the attained age at the time of the assessment, based upon the cost of insurance as estimated from past experience by the actuaries in old line insurance companies.

Assessment No. 149 was made upon this basis, and instead of being assessed $2, and the small costs provided for, Tuttle was called upon to pay $46.93 as one of the bi-monthly payments upon his reduced certificate of $2,500; and this amount he was informed he would be required to pay six times a year, making a total of $281.58 for the year as against $26.88, which was the extreme limit of the amount he agreed to pay under the original contract.

As we understand it, the intention and expectation of the association was, to increase the amount of such payments from year to year as the certificate holder attained a greater age. It will be seen at once that this was a complete departure from the original scheme and plan of the society as it existed when Tuttle became a member and received his certificate. The payments called for were no longer assessments to pay death losses, but became bi-monthly payments, having no regard to the number of deaths which had occurred in the society, but based entirely upon the actuary's estimates or theory as to what it would cost to insure a man at the age attained when the so-called assessment was made. At the same rates, if in good health, Tuttle could have entered and been insured in any old line insurance company organized on the stock plan.

It clearly appears, therefore, that this assessment No. 149 was not in accordance with the terms of the original contract, and we think the burden of showing its legality and the power of the officers of the association to make it, devolves upon appellant, because the law is well settled that the burden of proof to establish a forfeiture, by competent evidence, in such a case as this devolves upon the society. (Ind. Ord. of Foresters v. Zak, 136 Ill. 185; N. W. Travel. Men's Ass'n v. Schauss, 148 Ill. 304; Bagley v. A. O. U. W., 46 Ill. App. 411; Tourville v. B. of L. F., 54 Ill. App. 77. See also Farmers Fire Ins. Co. v. Knight, 162 Ill. 470.)

The argument of counsel for appellant in support of the legality of the assessment proceeds upon the theory that the underlying idea of these fraternal benevolent associations is that of absolute quality in the burden of providing the funds *pro rata* to benefits to be received, and the equality of benefits to be received *pro rata* the burden borne by those contributing to the fund; that a scheme was devised in the appellant corporation, which the governing body and its members believed would provide a sufficient fund to pay all the insurance or death losses as they occurred; that experience has demonstrated it will not do so; that the necessity of seeing decreasing membership and possible disruption of the society unless some change were made, became apparent to the governing body, and it resolved therefore to change the by-laws as to rates, by increasing them; that the law which governs such organizations and their members, and the details of their relations to each other, are expressed in their by-laws, and that such by-laws are in fact the constitution of the society, and that all contracts made by the association must be made with reference to such by-laws. It is contended that at the time the certificate in suit was issued, the by-laws of the association provided that they should be subject to amendment; that the by-laws formed part of the contract, and the contract therefore provided that it should be subject to amendment. The argument is certainly ingenious, but it seems to us it entirely overlooks the fact that the twelfth condition indorsed upon the certificate, and made a part thereof, expressly provides that the application for membership and the certificate, " shall constitute the complete and only contract " between the certificate holder and the association. If this language means anything, it certainly means what it says, and excludes any idea that the by-laws are to be looked to as a part of the contract. It would undoubtedly have been competent for the parties to have contracted with reference to the by-laws then existing, or which might thereafter be adopted, and when such contracts have been made they have been held binding.

The case of Fullenwider v. Royal League, 180 Ill. 621, cited by appellant, and much relied upon, was such a case. But that case is clearly distinguishable from the one under consideration, for the reason that the certificate issued to Fullenwider expressly provided he should comply thereafter " with the laws, rules and regulations now governing said council and fund, or that may hereafter be enacted by the supreme council to govern said council and fund, all of which are made part of the contract," etc. In deciding that Fullenwider was bound by this contract the opinion of the majority of the court says:

" The power to enact by-laws for the government of a corporate body is an incident to the existence of a body corporate and is inherent in it. The power to make such changes as may be deemed advisable is a continuous one. Where the contract contains an express provision reserving the right to amend or change by-laws, it can not be doubted that the society has the right so to do; and where, in a certificate of membership, it is provided that members shall be bound by the rules and regulations now governing the council or fund, or that may thereafter be enacted for such government, and those conditions are assented to and the member accepts the certificate under the conditions provided therein, it is a sufficient reservation of the right in the society to amend or change its by-laws."

The decision of that case clearly turned upon the fact that Fullenwider had contracted to be bound by the by-laws of the society then in force, or which might thereafter be enacted. In the case at bar there is no such reservation in the contract. On the contrary the application and certificate constitute the complete and only contract between the certificate holder and the defendant corporation. Hence we do not regard the Fullenwider case as being of controlling force in the decision of the question now before us.

It is contended by counsel for appellant that the by-laws in existence at the time the contract was made, entered into and formed a part of the contract, even though not referred to in the certificate, and that as those by-laws then in force reserved the right to the society to change and amend the same, the certificate holders must neces-

sarily be bound by all subsequent amendments to the by-laws affecting the obligations of the contract. Various authorities are cited, some of which certainly seem to support this view. But we think the better opinion is, even if it were conceded that the by-laws in force when the certificate ·was issued entered into and became a part of the contract, yet it was only those then in existence, and that the society ·has no right, by amending or repealing any of them, without the consent of the certificate holder, and in the absence of any such right reserved in the contract, to impose new conditions or burdens affecting the contract to his injury, or by a new provision passed after the making of the contract, to forfeit his rights under it. "The rights of the members stand entirely free from such control. In a contract of mutual benefit insurance the member acts for himself, and not as a part of the society; his rights rest upon his contract of insurance, and not upon his contract of membership in the society. A corporator in a mutual benefit society, like a stranger, may enter into a contract of insurance with it, and his rights under the contract will be as fully protected as those of a stranger." (Niblack on Ben. Soc., 2d Ed., Sec. 136, p. 273; N. W. Ben. & Mut. Aid Ass'n v. Warner, 24 Ill. App. 357; Ins. Co. v. Conner, 17 Pa. St. 136.)

In Cov. Mut. Ben. Ass'n v. Baldwin, 49 Ill. App. 203, which was an action against appellant in this suit to recover upon a similar certificate to the one here involved, and which had been issued upon the life of John H. Baldwin, it would seem from the language of the opinion that the contract there, as here, was contained in the application and the certificate, and it was held that so long as the assessments were made accordingly, the certificate holder was bound to pay them, and a failure therein would work a forfeiture; but that the directors could not, without his consent, change the contract.

We are of the same opinion, and without discussing that question further we hold that assessment No. 149 was levied without authority of law in contravention of the contract with Isaac C. Tuttle, and that a failure on his part to

pay it did not work or authorize a forfeiture of his certificate.

Much evidence was introduced upon the trial, over the objection of appellee, tending to show that the association could not remain solvent, continue to do business and pay death losses upon its outstanding certificates under the original plan which was in operation when the certificate was issued to Tuttle. It may perhaps be conceded, if that evidence is competent, that the proofs show the contract made with Tuttle and its other certificate holders prior to 1890, were improvident contracts; that the plan of insurance was faulty and would not meet the expectations of its founders. We are of opinion this evidence was not competent, but if it were, we do not see how the facts proven relieve appellant from liability. If, as we hold, the contract was valid and binding, and the society had no right of its own volition and without the consent of Tuttle to change it, we fail to see how the fact it had made an improvident contract based upon a false idea of its ability to carry on an insurance business as contemplated in the original plan can relieve it from liability to carry out the contract so far as it has the power, or furnish a warrant for the largely increased assessment complained of in this case.

It is to be observed that the society did not promise or guarantee to pay the beneficiary any particular sum on the death of the certificate holder. What it did agree to do in that event, was to levy an assessment upon its members and pay over to the beneficiary the proceeds of such assessment, not exceeding the sum named in the certificate. It may be that in time, as the death losses increased, the beneficiaries of the members outliving their fellows would not receive the full sum mentioned in their certificates; because of a failure of the assessments to realize the necessary amounts. This we believe to have been the experience of many of these so-called co-operative insurance associations. But granting that such a result would follow, still the society could keep its contract by levying an assessment upon the death of a member

as it agreed to do, and paying over to the beneficiary the avails thereof, however small the sum might be. That his beneficiary might not receive the full amount named in the certificate, if the holder thereof outlived his fellow members, was one of the chances he took when he entered into the contract and accepted that kind of insurance. And even that result would seem to be more favorable or desirable than that the certificate holder should be called upon to pay assessments more than ten times as great as he contracted to pay, and in default of such payments have his certificate declared absolutely forfeited; and that, too, when he had become an old man, and when perhaps from his inability to earn money it would be impossible for him to pay the increased assessments.

Take the case at bar as an illustration: Tuttle was in his fifty-ninth year of age when he became a member of the society and received his certificate on March 4, 1879. He paid all assessments levied against his certificate for about nineteen years, and up to the levy of No. 149, which he refused to pay. He was at this time nearly seventy-eight years old and had paid into the society, as the evidence shows, $1,837.96. On his original certificate of $5,000 he had contracted to pay not exceeding $26.88 per year, while on the certificate reduced to $2,500 he was required to pay $281.58 per year, or go out of the society and have his certificate forfeited; being thus left in his old age without a dollar of insurance, at a time of life when it might be doubtful as to his being able to procure it elsewhere.

It seems to us that a bare statement of these facts is sufficient to show the wrong and injustice of the assessment No. 149. It is no wonder that over 22,000 members of appellant society went out of the association during the year 1898 nor that after the levy of assessment No. 149, 16,432 of the members' certificates were forfeited for non-payment of this assessment.

Even though the power to make a change in the contract were conceded to appellant, we would be disposed to hold that such a radical change as this, which tended to

produce such apparent injustice and hardship, was so unreasonable and oppressive as to be void, and of no binding force upon the certificate holders.

Counsel for appellant seem to place a good deal of reliance upon the act of the general assembly approved and in force June 22, 1893 (Hurd's Stat. 1897, p. 960), governing associations such as appellant, as giving the corporation, by Sec. 5, the power to fix rates and assessments, and by Sec. 8, requiring it to accumulate an emergency fund. But it has been expressly held that the act of 1893 above referred to has no retroactive force, and does not apply to certificates issued by a society prior to its reorganization under that act. (Moore v. Guaranty Fund Life Soc., 178 Ill. 202; Voight v. Kersten, 164 Ill. 314.)

No change in the plan was necessary to create the emergency fund provided for in section 8 of the act referred to, because the evidence shows that when the change was made in 1890, appellant already had accumulated a surplus fund of $428,039.34, and in the spring of 1898, when assessment No. 149 was levied, the testimony of appellant's secretary shows that such surplus had reached the sum of $626,131.81. It is claimed that the change in plan and the increased assessments were necessary to avoid bankruptcy, and a showing is made that the contributions or assessments collected from the members in the old groups formed on the original plan, fell far short of paying the death losses occurring in such old groups; but this is not strange, if these groups are to be considered by themselves, and without reference to the newer membership, because, as we understand it, the whole theory of this kind of insurance is, that the fund will be fed and kept alive by new blood coming into the society, and not that the members furnishing the new blood will be set off into a separate class by themselves, and considered as a distinct group, having no relation to the older members of the society.

The examination made by the actuaries and insurance commissioners of different States, which were put in evi-

time subsequent to the changes of policy made in 1890, and appear to have relation to the manner of carrying on business under the new plan, and we think were immaterial and incompetent in this case. They were statements and opinions apparently procured at the instance and solicitation of appellant, in the absence of appellee, not under the sanction of an oath, without any opportunity for cross-examination, and it would seem to require no citation of authority to show that their admission was improper and erroneous. (Bagley v. Grand Lodge of A. O. U. W., 131 Ill. 498.) The only purpose of appellant in introducing this class of proofs, as we take it, was to show that the society could not carry out its original contract with Tuttle without loss to itself and possible insolvency. We have already shown that in our opinion this was not a sufficient reason for refusing to perform the contract as nearly as it was possible for it to do so.

But it is further insisted by appellant, that because the certificate holder, Tuttle, from 1890 to 1898 paid the assessments levied against his certificate, which assessments were not in accordance with the original contract, but a clear departure therefrom, that the beneficiary, appellee, is now estopped from denying the right of appellant to assess the assured upon any other than the original basis, and from holding the company liable when Tuttle elected not to pay assessment No. 149. Conceding that in a proper case the doctrine of estoppel can be applied in actions at law, it becomes important to know what Tuttle did which warrants appellant in now invoking the doctrine against appellee.

It is true that in 1890 assessments were levied, not only to pay death losses, but to create a permanent fund, and Tuttle paid the assessments.

In 1895 another change was made in the manner of assessing. The group plan was abolished, and each member was assessed according to the estimated cost of his insurance at the time he entered the society, and he was also assessed not only to pay death losses, but also for the purpose of creating a permanent fund. Rather than take the

possible chances of having his certificate forfeited and losing his insurance, Tuttle paid these assessments. Now this is the extent of his supposed wrong doing, upon which is predicated the right of invoking the doctrine of estoppel against appellee. Can it be, that because appellant violated its contract on former occasions by making illegal assessments, and Tuttle did not take the chance of having his certificate forfeited by refusing to pay them, that he or his beneficiary is estopped from denying the legality of assessment No. 149, which was for an amount so largely in excess of any previous assessment? We think not. He might have been content to pay a small increase on his original contract rate, and because he did so, shall it be said he was therefore bound to pay an amount ten times as great? We think to so hold would be unreasonable, and would be permitting the wrong-doer to invoke the doctrine of estoppel against the party injured. This, we think, ought not to be done. The doctrine of estoppel, when properly applied, is founded upon the highest principles of morality, and recommends itself to the common sense and justice of every one. Herman on Estoppel, p. 291, Sec. 272. Equitable estoppels, or estoppels *in pais*, only arise when the conduct of the party estopped is fraudulent in its purpose or unjust in its results. (Herman, p. 335, Sec. 321.) Or, as the rule is otherwise stated:

" Where one, by his words or conduct, willfully causes another to believe the existence of a certain state of things, and induces him to act on that belief, so as to alter his previous position, the former is concluded from averring against the latter a different state of things as existing at the same time." (Bigelow on Estoppel, pp. 433–434.)

It certainly can not be said that Tuttle, in paying previous illegal assessments, acted fraudulently, or that he willfully did anything calculated to mislead others to their injury. When he paid illegal assessments, he did so under a moral compulsion, and the threat, implied at least, that if he did not pay, his certificate would be forfeited, and the provision made for his wife in the event of his death be thereby lost. Did this conduct on his part warrant appel-

lant in increasing Tuttle's assessments tenfold? In other words, can appellant thus be permitted to take advantage of its own wrong? Would this commend itself to the common sense and justice of every one, or be in accordance with the highest principles of morality, upon which the doctrine of estoppel is said to have its foundation? We certainly think not. In a recent case decided in the Appellate Court of the Third District, against appellant (Rowell v. Covenant Mutual Life Association, opinion by Justice Wright, filed September 20, 1899), in discussing the same point, it is said :

"The suggestion that defendant was acting merely as the trustee of 26,000 other policy holders, puts them in no different attitude, for the actions of the association as trustees, were but the acts of the other members by their agent, and whatever a person does by his agent, he does by himself."

We concur in this view. But we think the Supreme Court of this State has substantially settled the question, in Farmers' Fire Ins. Co. v. Knight, 162 Ill. 470, which was a suit by Knight against the insurance company, to recover for a loss by fire, the defense being that by reason of his failure to pay an assessment levied against his policy, it had become suspended or forfeited and the company was not liable. He set up the illegality of the assessment, and the company invoked the doctrine of estoppel on the ground he had previously, on several occasions acquiesced in such illegal assessments by paying them. The point is thus disposed of in the opinion by Craig, J. :

"The evidence introduced on the trial, tends to prove that the managers of the insurance company, for several years, in making assessments, did not adhere to the statute, and that in a number of cases more money was raised than was at the time required to meet losses. But these violations of the statute did not ripen into a right; nor are we aware of any principle which would preclude a policy holder of the insurance company from calling in question the validity of an assessment, although he may have previously paid assessments which did not conform to the law. We do not think the doctrine of estoppel applies to such a case."

It seems to us, this language can with equal propriety be

applied in the case at bar, and is conclusive of the question under discussion.

Counsel for appellant attempt to draw a distinction between the Knight case and the one before us, but we are of the opinion the argument in support thereof is more ingenious than sound, and does not do away with the force of the decision.

Cases have been cited from other States which seem to support a contrary view to that expressed in the Knight case, but we are bound by the decisions of our own Supreme Court, regardless of what other courts may have decided.

The action of the court upon propositions of law submitted was in accordance with the views herein expressed, and we think there was no error therein.

We are of the opinion the judgment was right and must be affirmed.

Judgment affirmed.